**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) JAMMIE SARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-CV-0686-TCK-TLW |
| | ) | |
| (1) OKLAHOMA DEPARTMENT OF | ) | |
| HUMAN SERVICES; and, | ) | |
| (2) JOHN DOES 1-30, unknown | ) | |
| individuals Employed by | ) | |
| OKLAHOMA DEPARTMENT OF | ) | |
| HUMAN SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF**
**DEFENDANT OKLAHOMA DEPARTMENT OF HUMAN SERVICES**

Respectfully submitted,

*s/ Anastasia S. Pederson*
Anastasia S. Pederson (OBA #17118)
John E. Douglas (OBA #2447)
Assistant General Counsel
Department of Human Services
P.O. Box 25352
Oklahoma City, OK 73125-0352
Telephone: (405) 521-3638
Facsimile: (405) 521-6816
E-mail: Stacy.Pederson@okdhs.org

*Attorneys for Defendant Oklahoma*
*Department of Human Services*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES  ............................................................................... iii

MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT
     OF DEFENDANT OKLAHOMA DEPARTMENT
     OF HUMAN SERVICES  ............................................................................. 1

<u>Motion for Summary Judgment</u>  ............................................................... 1

<u>Brief in Support of Motion for Summary Judgment</u>  .................................... 1

   Statement of Facts Under LCvR56.1(b)  ......................................... 1

   Standard for Summary Judgment  ................................................... 9

   Argument and Authorities  ........................................................... 10

      I. DHS is entitled to summary judgment on Sartin's claim
       for failure to accommodate under the Americans With
       Disabilities Act (ADA).  ..................................................... 10

         A. Sartin did not request an accommodation under the
          ADA regarding travel to the Jay, Oklahoma office.  .............................. 11

         B. Sartin was permitted to drive her own vehicle, but mileage
          reimbursement – the actual remedy which she seeks – does
          not fall within the definition of reasonable accommodation.  ................. 13

         C. Sartin did not request an accommodation under the
          ADA regarding handicap accessible restrooms at
          the Jay, Oklahoma office.  ....................................................... 14

         D. No accommodation was necessary regarding handicap
          accessible restrooms because the Jay office was already
          equipped with handicap accessible restrooms.  ...................................... 14

         E. Sartin did not suffer an adverse employment
          action based upon the written reprimand.  ................................. 15

         F. Sartin did not suffer an adverse employment action
          based upon travel to the Jay, Oklahoma office.  ...................................... 16

G. Sartin did not suffer an adverse employment action based
upon moving Abe Helfinstine to her direct supervision.  ....................... 17

H. Sartin did not suffer an adverse employment action based upon
being deprived of timely performance evaluations, nor did Sartin
exhaust her administrative remedies regarding this allegation.  ............. 17

I.  Sartin did not suffer an adverse employment action when she
did not receive flowers from her supervisor.  ......................................... 18

II. DHS is entitled to summary judgment on Sartin's claim of
retaliation under the Family Medical Leave Act.  ............................................ 19

A. The written reprimand given to Sartin is not
a materially adverse action.  .................................................................... 20

B. Travel to the Jay, Oklahoma office is not a materially
adverse action.  ......................................................................................... 21

III. Sartin's Oklahoma Anti-Discrimination Act (OADA) claim
fails for the same reasons as her federal claims because
OADA mirrors federal anti-discrimination protection.  .................................. 22

IV.  A claim of intentional infliction of emotional distress cannot
be maintained against DHS under the Government Tort
Claim Act because intentional infliction of emotional
distress cannot be inflicted in good faith.  ...................................................... 23

V. CONCLUSION  ............................................................................................. 24

CERTIFICATE OF SERVICE  ............................................................................. 25

# **TABLE OF AUTHORITIES**

## **CASES**

**Page**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)  ..........................................  10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986)  ................................  10

*Barzellone v. City of Tulsa*,
   210 F.3d 389, 2000 WL 339213 (10th Cir. 2000) (unpublished)  ..................................  23

*Bennett v. Windstream*, 30 F.Supp3d 1243, 1259 (N.D. Okla. 2014)  ......................................  23

*Burlington Northern & Santa Fe Ry. Co. v. White*,
   548 U.S. 53, 126 S.Ct. 2405, 2415, (2006)  ..............................................................  19, 20

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)  ...................................................  9

*Chang v. Safe Horizons,* 254 Fed.Appx. 838, 839 (2d Cir.2007) (unpublished) .....................  20

*DeHart v. Baker Hughes Oilfield Operations, Inc.,*
   214 Fed.Appx. 437, 442 (5th Cir.2007)  ..............................................................  20

*Daniels v. United Parcel Service, Inc.*, 701 F3d. 620, 635 (10th Cir. 2012) ...........................  22

*EEOC v. C.R. England,*
   644 F.3d 1028, 1049 (10th Cir. 2011)  ...........................................  11, 13, 14, 15, 16, 17, 18

*Felix v. City and County of Denver*, 729 F. Supp. 2d 1243, 1258  (D. Colo. 2010)  ..........  20, 21

*Hawkins v. Smith*, 46 F. Supp. 3d 1175, 1187 (N.D. Okla. 2014)  .......................................  16, 23

*Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003)  .......................................................  18

*McMullen v. City of Del City*, 920 P.2d 528 (Okla. Ct. App. 1996)  .......................................  24

*Mac Kenzie v. City and County of Denver,*
   414 F.3d 1266, 1279 (10th Cir. 2005)  ............................................................  19

*McCully v. American Airlines, Inc.,*
   695 F. Supp. 2d 1225, 1247 (N.D. Okla. 2010)  ............................................................  23

*Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983)  ....................................................  10

*Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) .................................................... 10

*Shockency v. Ramsey County,* 493 F.3d 941, 950 (8th Cir.2007) ............................................ 20

*Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir. 2014) ............................... 19

## FEDERAL STATUTES

29 U.S.C. § 2615(a) ................................................................................................ 19

42 U.S.C. 12111(9)(A)-(B) ....................................................................................... 13

42 U.S.C. § 12112(a) ............................................................................................. 10

42 U.S.C. § 12112(b)(1) ......................................................................................... 15

42 U.S.C. § 12112(b)(5)(A) ..................................................................................... 10

## OKLAHOMA STATUTES

25 O.S. § 1302 (A) ................................................................................................ 23

25 O.S. § 1302 (A)(1) ............................................................................................ 23

25 O.S. § 1350(F) ................................................................................................. 23

25 O.S. § 1350(F) ................................................................................................. 23

51 O.S. §153(A) ................................................................................................... 24

**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF
DEFENDANT OKLAHOMA DEPARTMENT OF HUMAN SERVICES**

### Motion for Summary Judgment

Comes now the Defendant, Oklahoma Department of Human Services ("DHS"), through its undersigned attorneys and respectfully moves the Court for summary judgment in its favor pursuant to Fed. R. Civ. P. 56(c) for the reason that there is no genuine issue of material fact and DHS is entitled to judgment as a matter of law on the claims asserted against it. In her Petition, originally filed in Ottawa County and removed to this Court (Doc. #2-2), Plaintiff, Jammie Sartin ("Sartin") asserts claims against DHS for retaliation for exercising her rights under the Family and Medical Leave Act (FMLA), discrimination by failing to accommodate her under the Americans with Disabilities Act (ADA), discrimination based upon the Oklahoma Anti-Discrimination Act (OADA), and the tort of intentional infliction of emotional distress. She had also asserted claims of interference under the FMLA, hostile work environment under the ADA, retaliation under the ADA, and negligence; however, those claims were dismissed by Order of this Court. (*See Order and Opinion* (Doc. #29)).  DHS now moves for summary judgment on all of Sartin's remaining claims.

### Brief In Support of Motion for Summary Judgment

**Statement of Facts Under LCvR56.1(b)**

1.  Sartin has worked for DHS since March 16, 2001 (15 years).  (Exhibit #1, Position Requisition).

2.  Sartin is currently employed by DHS. (Exhibit #2, Affidavit of Martha Thompson, ¶5).

3.  Sartin's job responsibilities - in her own words - included, "overseeing daily operations of 2 offices, one in Miami the other in Jay, OK.  Traveling between both offices 72 miles round-trip several times per week, handling finance update (sic) for both offices."   (Exhibit #3,

Certification of Health Care Provider for Employee's Serious Health Condition (FMLA), page 1) (This was written prior to the consolidation of the two offices.)

4. For the majority of 2014 Sartin traveled to the Jay, Oklahoma office "at least two days a week, sometimes more" and in October and November 2014 she traveled to Jay five days a week. (Exhibit #4, Plaintiff's deposition at page 7, lines 10 to 14).

5. Martha Thompson ("Thompson") has been Sartin's supervisor from June 30, 2001, until April 30, 2016, when Thompson retired. (Exhibit #2, Affidavit of Martha Thompson, ¶3).

6. Until her retirement, Thompson was the only local DHS employee at a management level above Sartin at the Miami and Jay, Oklahoma DHS Child Support Offices. Sartin supervises the professional level staff at both office locations. (Exhibit #2, Affidavit of Martha Thompson, ¶4 and Petition at ¶14).

7. In October 2014, Sartin informed her supervisor (Thompson) that she would require leave for knee replacement surgery which had been scheduled for December 1, 2014. (Exhibit #2, Affidavit of Martha Thompson at ¶7).

8. Sartin requested leave under the Family and Medical Leave Act (FMLA) for her Surgery. (Exhibit #3, FMLA Certification of Health Care Provider, page 2).

9. Thompson had a casual conversation with Sartin regarding her planned knee surgery and recovery. Sartin expressed concern about how long the recovery period would take. In an attempt to reassure her, Thompson mentioned that she has a friend who had knee replacement surgery at age 72 and returned to work three weeks after surgery. Thompson also mentioned that she knows another person at DHS state office who returned to work three to four weeks after knee replacement surgery. (Exhibit #2, Affidavit of Martha Thompson, ¶9).

10. Thompson did not tell Sartin that she expected Sartin to return to work in only three to four or even five weeks after her surgery, nor did Thompson have such an expectation. Thompson expected Sartin to return to work whenever her doctor released her to return to work. (Exhibit #2, Affidavit of Martha Thompson, ¶10).

11. Thompson initially suggested Sartin's leave would be approved for five weeks (with end date of January 2, 2015) and Sartin could contact Thompson if she needed additional time. (Exhibit #2, Affidavit of Martha Thompson, ¶11).

12. However, Sartin submitted her leave request for six weeks of leave (with end date of January 9, 2015). Thompson indicated her approval of Sartin's leave request, for the full amount of time she requested, 32 minutes after Sartin submitted the request. (Exhibit #5, Email chain of November 26, 2014, between Sartin and Thompson).

13. During the weeks leading up to Sartin's surgery, Thompson had numerous conversations with Sartin about many office issues, including how they would cover the finance duties in Sartin's absence. These conversations were particularly important because David Morris, the primary person who handled finance updates at the Jay office, resigned in September 2014 and a new person had not been trained to handle this task. Thompson even told Sartin that she was considering seeking additional help from DHS state office to assist with this task. However, during these conversations, Sartin told Thompson numerous times that she would make sure that the finance updates for the Jay, Oklahoma office were up to date before she left for leave. (Exhibit #2, Affidavit of Martha Thompson, ¶13).

14. Sartin's first day of leave was December 1, 2014. This was also the date of her knee replacement surgery. (Exhibit #2, Affidavit of Martha Thompson, ¶14).

15. While Sartin was out on leave, multiple customer complaints caused Thompson to learn that numerous finance updates at the Jay, Oklahoma office had not been entered into the computer system.  (Exhibit #2, Affidavit of Martha Thompson, ¶15).

16.  While Sartin was out on leave Thompson also learned that Sartin had referred to the Jay, Oklahoma office staff as "dumbasses".  The comment was made by Sartin in mid-November 2014, and was heard by several members of the Jay office staff.  Thompson was made aware of this after it was disclosed during the course of investigating a grievance filed by Robert Simington.  (Exhibit #2, Affidavit of Martha Thompson, ¶17).

17. On December 15, 2014, also while Sartin was out on leave, Thompson learned that Sartin had borrowed money from her subordinate, Kim Carter. Carter disclosed this information to Thompson because Carter believes that ill-feelings since the time of the loan have caused Sartin to dislike her.  Carter told Thompson that she believes that Sartin's dislike of her played a significant role in her failure to be selected for a supervisory position.   Carter also told Thompson that Sartin had borrowed substantial sums of money from other staff members. (Exhibit #2, Affidavit of Martha Thompson, ¶19).

18. Sartin has no reason to think that Thompson knew about Carter's allegations prior to December 2014.  (Exhibit #4, Plaintiff's deposition, at page 26, lines 20 to 22).

19. Sartin used a combination of paid leave (annual and/or sick leave), shared leave, and unpaid leave while she was out for her surgery.  (Exhibit #2, Affidavit of Martha Thompson, at ¶21).

20. Shared leave is an Oklahoma state agency concept whereby other employees may "donate" their own accrued sick leave to someone who qualifies. Sartin was approved for shared leave and she received some donations of shared leave.  However, she received insufficient

donations of shared leave to cover the full time that she was out for her surgery.  After all of Sartin's annual leave, sick leave, and shared leave were used, her remaining time away from the office was classified as "approved, unpaid leave."  (Exhibit #2, Affidavit of Martha Thompson, at ¶22).

21.  Sartin is upset that Thompson did not donate her accrued sick leave to Sartin.  However, she admits that Thompson had no obligation to donate her own shared leave to Sartin or to any other employee.  (Exhibit #4, Plaintiff's deposition, at page 57, line 5 through page 58, line 10).

22. Sartin's medical provider released her to return to "regular duty" on January 12, 2015 with "NO RESTRICTIONS".  (Exhibit #6, medical record of P. Heath Horinek dated 12/31/14) (emphasis in original).

23. Sartin returned to work following her surgery on January 12, 2015.  (Exhibit #2, Affidavit of Martha Thompson, ¶26).

24. Sartin needed to attend physical therapy appointments three times a week for at least two weeks following her return to work.  She was able to attend all necessary physical therapy appointments by going before or after work hours.  (Exhibit #4, Plaintiff's deposition at page 16 line 22 through page 17 line 22).

25. When Sartin returned to work following her surgery, she resumed her travel to the Jay, Oklahoma office.  She did this without any request or demand by Thompson.  (Exhibit #2, Affidavit of Martha Thompson, ¶28).

26. When she returned from surgery in January 2015, Sartin traveled to Jay an average of 2.77 times per week during her first six months back at work.  (Exhibit #7, Sartin's calendar recording travel).

27. Sartin was served with a written reprimand on January 20, 2015, which addressed the performance and conduct issues which Thompson had learned while Sartin was on leave. (Exhibit #2, Affidavit of Martha Thompson, ¶31).

28. The issues addressed in the written reprimand were: (1) Sartin's failure to complete the finance updates in the Jay, Oklahoma office; (2) Sartin's reference to the Jay office staff collectively as "dumbasses"; (3) an allegation that Sartin had borrowed money from a subordinate. (Exhibit #8, Written Reprimand dated January 20, 2015).

29. Sartin admits that she referred to the Jay, Oklahoma office staff as "dumbasses", but denies the allegations regarding the other two issues in the Written Reprimand. (Exhibit #4, Plaintiff's deposition, at page 23 lines 25 through page 24 line 4).

30. Sartin admits that it is inappropriate to refer to her subordinate staff as dumbasses. (Exhibit #4, Plaintiff's deposition, at page 24, line 25 though page 25, line 3).

31. Typically, there is a state-owned vehicle available for Sartin's use for travel between Miami and Jay, Oklahoma.  Both before and after her surgery, Sartin would sometimes use her own personal vehicle instead of the state-owned vehicle.  When she used her own car, she didn't submit a claim for mileage reimbursement, except for a few rare occasions when the state-owned vehicle was not available.  (Exhibit #4, Plaintiff's deposition at page 41 line 24 through page 42 line 8 and page 42  line 24 through page 43 line 8).

32. Sartin never advised Thompson that it was uncomfortable or painful for her to drive the state-owned vehicle.  (Exhibit #2, Affidavit of Martha Thompson, ¶34).

33. Sartin did not make a written or verbal request to Thompson asking if she could be reimbursed for driving her personal vehicle if the State vehicle was available.  (Exhibit #9,

EEOC Intake Questionnaire at page #3 and Exhibit #4, Plaintiff's deposition at p.39, lines 1 through 14 and Exhibit #2, Affidavit of Martha Thompson, ¶35).

34. Sartin did not ask Thompson if she could work exclusively at the Miami, OK office without travel to Jay.  (Exhibit #2, Affidavit of Martha Thompson, ¶36).

35. Thompson was aware that Sartin often drove her personal vehicle for travel to Jay, Oklahoma both before and after her surgery.  Thompson assumed this was because she could smoke in her personal vehicle but she could not smoke in the State vehicle.  (Exhibit #2, Affidavit of Martha Thompson, ¶37).

36.  Sartin did not request a reasonable accommodation under the Americans with Disabilities Act through the procedure outlined in Oklahoma Administrative Code 340:1-11-45. The DHS Office of Civil Rights has no record that Sartin made a written or verbal request for a reasonable accommodation or any complaint of discrimination prior to her Charge of Discrimination filed with the Equal Employment Opportunity Commission.  (Exhibit #10, Affidavit of William Drapala, at ¶5).

37. Sartin did not make a request for a reasonable accommodation to Thompson regarding handicap accessible restrooms in the Jay, Oklahoma office.  (Exhibit #2, Affidavit of Martha Thompson, ¶38).

38. The only communication made by Sartin regarding the restrooms in the Jay office was in an email chain discussing carpet and other maintenance issues.  The first email in the chain describes several carpet and maintenance issues. Sartin responded to that email by stating, "(i)n addition to all of the below mentioned (carpet and maintenance issues), there needs to be handicapped support rail installed in each of the private bathrooms in the back of the building." (Exhibit #11, email chain of March 3, 2015, between Plaintiff and Martha Thompson).

39. Sartin's email of March 3, 2015, did not include any reference to herself or her own disability.   (Exhibit #11, email chain of March 3, 2015, between Plaintiff and Martha Thompson).

40. Prior to the March 3, 2015, email, Sartin had never let anyone know that there was a problem with handicap accessibility to the restrooms in the Jay, Oklahoma office.  (Exhibit #4, Plaintiff's deposition at page 35, lines 18-21).

41. Sartin never told Thompson that she was having any problem regarding handicapped-accessible restrooms in the Jay office or made any request of Thompson regarding the restrooms which referenced her disability.  (Exhibit #2, Affidavit of Martha Thompson, ¶41).

42.  There are handicapped-accessible public restrooms in the Jay, Oklahoma Child Support Office.  They are about ten to fifteen feet further from Sartin's desk than the employee restrooms which are not handicapped-accessible.  (Exhibit #4, Plaintiff's deposition, page 44 lines 11 - 17).

43. Sartin's job responsibilities include property management issues. It was within her authority to seek installation of additional handicap grab bars if they were needed.  (Exhibit #2, Affidavit of Martha Thompson at ¶44).

44.  Thompson  consistently  provided  Sartin  with  timely  performance  evaluations throughout Sartin's years of employment, with the exception of the evaluation which came due at the end of June 2015.  (Exhibit #2, Affidavit of Martha Thompson, ¶45)

45. The absence of the June 2015 performance evaluation did not have any impact upon Sartin's employment status, job opportunities, or benefits.  (Exhibit #2, Affidavit of Martha Thompson, ¶46).

46. The absence of the June 2015 performance evaluation occurred after the filing of Sartin's EEOC Charge in May 2015.  (Exhibit #12, EEOC Charge of Discrimination, dated May 19, 2015).

47. Abe Helfinstine, a DHS employee assigned to the Jay, Oklahoma office, was moved to be under Sartin's supervision in May 2015.  (Exhibit #2, Affidavit of Martha Thompson at ¶48).

48. Helfinstine remained under Sartin's direct supervision until November 30, 2015, when he retired.  (Exhibit #2, Affidavit of Martha Thompson at ¶48).

49. At the time that Helfinstine was moved to Sartin's supervision, she supervised a number of employees at both the Jay, Oklahoma and Miami, Oklahoma office locations. (Exhibit #2, Affidavit of Martha Thompson at ¶49).

50. Supervision of Helfinstine did not represent a significant change in Sartin's job responsibilities, employment status, job opportunities, or benefits. (Exhibit #2, Affidavit of Martha Thompson, ¶50).

51. In January 2015, Thompson bought flowers for two employees, neither of whom was Sartin. Despite Sartin's belief that this was a retaliatory act, it had no impact upon Sartin's employment status, job opportunities, or benefits.  (Exhibit #2, Affidavit of Martha Thompson at ¶51 and Exhibit #4, Plaintiff's Deposition at page 26, line 23 through page 27, line 6).

**Standard for Summary Judgment**

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The moving party has the burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983). In response to a motion for summary judgment, the plaintiff must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of the elements essential to the plaintiff's case. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). To defeat a motion for summary judgment, evidence including testimony, must be based on more than mere speculation, conjecture, or surmise. *Id.* Unsubstantiated allegations carry no probative weight in summary judgment proceedings. *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986).

**Argument and Authorities**

**I.   DHS is entitled to summary judgment on Sartin's claim for failure to accommodate under the Americans with Disabilities Act (ADA).**

The ADA prohibits employment discrimination on the basis of an employee's disability. 42 U.S.C. § 12112(a). "Discrimination under the ADA includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an… employee…" 42 U.S.C. § 12112(b)(5)(A). However, before an employer's duty to provide reasonable accommodations – or even participate in the interactive process - is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice. The request for accommodation must be sufficiently direct and

specific, giving notice that the employee needs a special accommodation.  Although the notice or request does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear that the employee wants assistance *for his or her disability*.  *EEOC v. C.R. England*, 644 F.3d 1028, 1049 (10th Cir. 2011) (internal citations and quotations omitted; emphasis in original).

Sartin did not make a direct or clear request for an accommodation.  The Oklahoma Administrative Code provides that employees of DHS may file a request for a reasonable accommodation "verbally or on Form ADA-1, Request for Reasonable Accommodation." OAC 340:1-11-45 (a).  Sartin did not complete a Form ADA-1, nor is there any known record of a written request for accommodation made by Sartin.  (Exhibit #10, Affidavit of William Drapala at ¶6 and Exhibit #2, Affidavit of Martha Thompson at ¶35).

### A. Sartin did not request an accommodation under the ADA regarding travel to the Jay, Oklahoma office.

In her Petition, Sartin alleges that she requested an accommodation, but she does not allege what the content of the request was.  Significantly, Sartin does not *allege* that she made a request to be allowed to work exclusively in the Miami, Oklahoma office, nor did she *ever* make that request.  In addition, Sartin indicated on an EEOC Intake Questionnaire that she "didn't actually ask" for an accommodation.  The questionnaire asked her to, "[d]escribe the changes or assistance that you asked for."  Plaintiff's complete response to that question was:

> "**I didn't actually ask**, but I explained that I needed to be able to drive my own vehicle as it is higher from the ground than out (sic) state provided vehicle and does not hurt me as bad to get in and out of. I have driven my own vehicle ever since but I an (sic) not able to file for mileage reimbursement because the state car is available for me to drive."  (Exhibit #9, EEOC Intake Questionnaire at p. 3.) (emphasis added).

Sartin also admitted in her deposition that she never asked for an accommodation:

Question (by Ms. Pederson). "So is it correct to say that the - - the problem was not that you shouldn't drive at all?  In your view the problem was the difference in the two cars?"

Answer (by Ms. Sartin). "A lot of it."

Question. "Did you ever tell Martha Thompson that you were - - that you were uncomfortable in the state Impala?"

Answer. "Yes"

Question. "Do you remember when you had that conversation?"

Answer. "In January of 2015.  I don't remember the exact date.  But I told her I could not drive the state car, it hurts me to get in and out of it."

Question. "What did she say?"

Answer. "It hurts your leg?  And I said, my knee always hurts, by it also hurts my back."

Question. "Did you ask her to do anything about that?"

Answer. "**<u>Shouldn't have had to</u>**."

Question. "Well, did you tell her what you wanted?"

Answer. "I told her I had to drive my car because I can't get in and out of the state car."

Question. "Did you tell her anything like you thought you should be reimbursed for using your car?"

Answer. "**<u>I believe it was implied</u>**. She went to great lengths to educate the office on not driving their personal vehicles because the state couldn't afford to pay mileage.  Even had it added to a staff meeting later in the year.
        "**<u>I did not ask her specifically if I could use my car and be compensated</u>**.  But I believe it was implied that I would like to use my vehicle and still be compensated, since I was being forced to work in the Jay office five days a week, three to five days a week."
(Exhibit #4, Plaintiff's deposition, page 38 line 9 through page 39 line 18).
(emphasis added).

Sartin's statements regarding her alleged request for an accommodation include: "I didn't

actually ask," I "(s)houldn't have had to" ask, "I believe it (my request) was implied," and "I did

not ask her specifically."  These statements demonstrate that Sartin did not make a request which was "sufficiently direct and specific" to give notice to DHS that she needed a specific accommodation as required by *EEOC v. England*. *C.R.. England*, 644 F.3d at 1049.  Sartin's accommodation claim fails because she did not make an adequate request, and thus DHS's obligation under the ADA to provide a reasonable accommodation was never triggered.  *C.R. England* at 1049.

     **B.  Sartin was permitted to drive her own vehicle, but mileage reimbursement - the actual remedy which she seeks - does not fall within the definition of reasonable accommodation.**

It should also be noted that DHS never prevented Sartin from driving her own vehicle. Sartin admits in her EEOC Intake Questionnaire that "I have driven my own vehicle ever since." (Exhibit #9, EEOC Intake Questionnaire at p.3).  Sartin's only complaint is that she was not reimbursed for driving her own vehicle.  However, Sartin never asked to be reimbursed for driving her own vehicle.  *(*Exhibit #4, Plaintiff's deposition, p. 38 line 9 through p. 39 line 2 and Exhibit #9, EEOC Intake Questionnaire at p.3*)*.  In any event, reimbursement for driving one's own vehicle does not fall within the definition of "reasonable accommodation" under the ADA:

    **"(9) Reasonable accommodation**
The term "reasonable accommodation" may include--
**(A)** making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
**(B)** job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."
42 U.S.C. 12111(9)(A)-(B).

For these reasons, Sartin's failure to accommodate claim regarding use of her own vehicle fails.

**C. Sartin did not request an accommodation under the ADA regarding handicap accessible restrooms at the Jay, Oklahoma office.**

Sartin also did not make a request for an accommodation under the ADA related to handicap accessible restrooms in the Jay, Oklahoma office.  The only communication Sartin made regarding the restrooms in Jay was in an email chain discussing carpet and other office maintenance issues.  The first email in the chain describes several carpet and maintenance issues.  Sartin responded to that email by stating, "In addition to all of the below mentioned, there needs to be handicapped support rail installed in each of the private bathrooms in the back of the building."  (Exhibit #11, Email chain of March 3, 2015).  Prior to this email, Sartin had never let anyone know that there was a problem with handicap accessibility to the restrooms.  (Exhibit #4, Plaintiff's deposition at page 35, lines 18-21).  The emailed statement doesn't make any indication that Sartin is seeking this assistance for her own disability.  A communication by an employee cannot be considered as a request for an accommodation if it does not reference the employee's disability or indicate the request is made in order to assist the employee with her disability. *C.R. England*, 644 F.3d at 1049.  Sartin's email regarding handicap support rails lacks the necessary specificity to trigger DHS's obligations under the ADA, and her claim based upon this alleged request should fail. *Id.*

**D. No accommodation was necessary regarding handicap accessible restrooms because the Jay office was already equipped with handicap accessible restrooms.**

The Jay Child Support Office is already equipped with handicapped accessible restrooms. (Exhibit #4, Plaintiff's deposition at page 35, lines 6 through 13).  The handicap accessible restrooms are about 10 to 15 feet further from Sartin's desk than the employee restrooms. (Exhibit #4, Plaintiff's deposition at page 44, lines 11 through 17).  Thus, no accommodation

14

was necessary in order for Sartin to have access to handicap accessible restrooms at the Jay, Oklahoma office.

### E. Sartin did not suffer an adverse employment action based upon the written reprimand.

Even if the Court were to determine that Sartin did trigger DHS' duties under the ADA through an adequate request for an accommodation, she didn't suffer any adverse employment action.   As part of her prima facie case of discrimination, Sartin must demonstrate the she suffered from an "adverse employment action."   *C.R. England*, 644 F.3d at 1039.   In fact, § 102(b)(1) of the ADA explicitly limits the Act's discriminatory prohibition to employer actions that "*adversely affect* [  ] the opportunities or status" of the employee.   42 U.S.C. § 12112(b)(1). (emphasis added).   In general, only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action.   A mere inconvenience or an alteration of job responsibilities does not constitute an adverse employment action.   A plaintiff must show that the alleged adverse action caused more than *de minimis* harm to or a *de minimis* impact upon an employee's job opportunities or status."   *C.R. England*  at 1039 -1040.

Sartin appears to claim that the written reprimand she received on January 20, 2015, was an adverse employment action.  However, a written reprimand does not meet the standards set forth in  *C.R. England*  to qualify as an adverse employment action since it does not impact an employee's employment status, job opportunities, or benefits.  In addition, the Northern District of Oklahoma has recently stated in the context of an ADA reasonable accommodation case that, "…a written reprimand, even when accompanied by a probationary period, is not a tangible employment action when it is not accompanied by a suspension, pay reduction, or other loss of

benefits." *Hawkins v. Smith*, 46 F. Supp. 3d 1175, 1187 (N.D. Okla. 2014).   The written reprimand served on Sartin did not result in any change of pay, benefits, or employment status and thus it does not amount to an adverse employment action.   Thus, Sartin cannot establish a *prima facie* case of discrimination based upon the reprimand.

### F.  Sartin did not suffer an adverse employment action based upon travel to the Jay, Oklahoma office.

To the extent that Sartin is claiming that an alleged increase in her travel to the Jay, Oklahoma office was an "adverse employment action," this claim fails as well because travel to Jay was already a part of Sartin's job responsibilities before her surgery and FMLA leave.   There was no significant change in this job responsibility after her surgery. Prior to her surgery, Sartin traveled to the Jay Child Support office "several times per week" (according to her FMLA paperwork) or "at least two days a week, sometimes more" (according to her deposition testimony).   (See Exhibit #3, Certification of Health Care Provider for Employee's Serious Health Condition FMLA and Exhibit #4, Plaintiff's deposition at page 7, lines 11 through 12). She also testified at her deposition that she was traveling to Jay "basically five days a week" in October and November 2014.   (Exhibit #4, Plaintiff's deposition at page 7, lines 12 – 14).   When she returned from surgery in January 2015, she traveled to Jay an average of 2.77 times per week during her first six months back at work, according to a calendar kept by Sartin.   (Exhibit #7, Sartin's calendar documenting travel).   Her travel to Jay following surgery does not represent *any* alteration of her job responsibilities.   Only *significantly* different responsibilities amount to an adverse employment action.   A mere inconvenience or an alteration of job responsibilities does not constitute an adverse employment action.   *C.R. England* at 1039 -1040.   For these reasons, Sartin cannot establish a *prima facie* case of discrimination based upon travel to the Jay office.

**G. Sartin did not suffer an adverse employment action based upon moving Abe Helfinstine to her direct supervision.**

Sartin alleges that one of the acts of discrimination against her was "reassignment of supervisory duties of personnel." (Petition, Doc.#2-2 at ¶31). This is a reference to moving a single employee, Helfinstine, to be under Sartin's supervision. (Exhibit #4, Plaintiff's deposition at p.73, line 8 through page 74, line 16.). However, supervision of Helfinstine did not represent any significant change in Sartins' job responsibilities. Sartin acknowledges that her job responsibilities include "direct supervisory responsibility over the professional level staff." (Petition, Doc.#2-2 at ¶ 14). Only *significantly* different responsibilities amount to an adverse employment action. A mere inconvenience or an alteration of job responsibilities does not constitute an adverse employment action. *C.R. England, 644 F.3d* at 1039 - 1040. Supervision of Helfinstine does not amount to an adverse employment action, and thus Sartin cannot establish a *prima facie* case of discrimination based on her supervision of Helfinstine.

**H. Sartin did not suffer an adverse employment action based upon being deprived of timely performance evaluations, nor did Sartin exhaust her administrative remedies regarding this allegation.**

Sartin alleges that it was discriminatory for her to be "deprived of timely performance evaluations." (Petition, Doc.#2-2 at ¶31). Thompson consistently provided Sartin with timely performance evaluations throughout Sartin's years of employment, with the exception of the evaluation which came due at the end of June 2015. (Exhibit #2, Affidavit of Martha Thompson at ¶45). The absence of the June 2015 performance evaluation did not have any impact on Sartin's employment status, job opportunities or benefits, and thus it does not rise to the level of an adverse employment action under *C.R. England*, 644 F.3d at 1039 - 1040. (Exhibit #2, Affidavit of Martha Thompson at ¶46). Thus, Sartin cannot establish a *prima facie* case of discrimination based upon absence of the June 2015 performance evaluation.

17

In addition, failure to provide the June 2015 performance evaluation occurred after the May 2015 filing of Sartin's EEOC Charge, and thus it was not included in the Charge.  (Exhibit #2, Affidavit of Martha Thompson at ¶47 and Exhibit #12, EEOC Charge of Discrimination).  Each discrete incident of discrimination and each adverse employment decision constitutes a separate actionable 'unlawful employment practice' for which administrative remedies must be exhausted.  *Martinez v. Potter,* 347 F.3d 1208, 1210 (10th Cir. 2003).  This "rule is equally applicable… to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint."  *Id*. at 1210-1211 (emphasis in original).  Even if absence of the June 2015 evaluation did amount to an adverse employment action, which it does not, this incident was not included in Sartin's EEOC Charge, and thus she has not exhausted her administrative remedies as to this incident.

## I.   Sartin did not suffer an adverse employment action when she did not receive flowers from her supervisor.

Sartin claims that it was discriminatory for Thompson to give flowers to two other employees, but not to her.  (Exhibit #9, EEOC Intake Questionnaire at p. 2 and Exhibit #4, Plaintiff's deposition at page 26, line 23 through page 27, line 8).  Failure to receive flowers did not impact Sartin's employment status, job opportunities or benefits, and thus it does not rise to the level of an adverse employment action under *C.R. England*, *644 F.3d* at 1039 - 1040. (Exhibit #2, Affidavit of Martha Thompson at ¶51).  Thus, Sartin cannot establish a *prima facie* case of discrimination based upon her failure to receive flowers.  "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a

discrimination suit." *Mac Kenzie v. City and County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005). Not receiving flowers clearly falls into the trivial category.

## II. DHS is entitled to summary judgment on Sartin's claim of retaliation under the Family and Medical Leave Act.

The FMLA makes it unlawful for an employer to retaliate against an employee for exercising her rights to FMLA leave. *See* 29 U.S.C. § 2615(a). To establish a prima facie case of retaliation under the FMLA, a plaintiff must show (1) she engaged in a protected activity by taking FMLA-protected leave; (2) the employer took a materially adverse action against her; and (3) the circumstances permit an inference of causal connection between the two events. *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir. 2014). In this case, it is undisputed that Sartin engaged in protected FMLA activity by taking leave; however, she will be unable to establish that a materially adverse action was taken against her. Thus, she will be unable to establish either the second or third elements of her claim.

The United States Supreme Court has made clear that the test for the second prong of a retaliation claim is an objective one. *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, (2006). There, the Court stated:

> In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace. *Burlington Northern,* 126 S.Ct. at 2415.

Regarding Plaintiff's FMLA retaliation claim, Defendant "allegedly took two actions that could plausibly be deemed adverse: (1) giving Plaintiff a written reprimand; and (2) forcing Plaintiff to

commute one hour each way following knee replacement…"  Opinion and Order at p.#5 (Doc. #29).  Each will be addressed below.

### A.  The written reprimand given to Sartin is not a materially adverse action.

Sartin maintains that her receipt of a written reprimand was a retaliatory adverse action. In *Felix v. City and County of Denver*, 729 F. Supp. 2d 1243, 1258 (D. Colo. 2010), the court discusses several cases which have considered whether a written reprimand constitutes a materially adverse action under the standard announced in *Burlington Northern*:

> For example, in *Chang v. Safe Horizons,* 254 Fed.Appx. 838, 839 (2d Cir.2007) (unpublished), the court characterized written warnings issued to an employee as the kind of "trivial harms" described by *White [Burlington Northern],* particularly where the employer is nominally applying its existing disciplinary rules and policies in a reasonable manner. In *Shockency v. Ramsey County,* 493 F.3d 941, 950 (8th Cir.2007), the court affirmed the grant of summary judgment to an employer on a retaliation claim where the employee claimed that his supervisor "criticized him in writing and placed reprimands in his file for routine actions which other officers were allowed to do without criticism," … The court recognized that although such actions diminished the employee's job satisfaction, "it was not significantly more severe than exhibiting general hostility which is insufficient to be an adverse employment action." *Id.* In *DeHart v. Baker Hughes Oilfield Operations, Inc.,* 214 Fed.Appx. 437, 442 (5th Cir.2007) (unpublished), the court found that a written warning issued for "insubordination, for being argumentative, and for excessive absenteeism" was not an adverse action where "there were colorable grounds for the warning and a reasonable employee would have understood that a warning under these circumstances was not necessarily indicative of a retaliatory mind-set*." Felix,* 729 F. Supp. 2d at 1258.

The *Felix* Court stated that the warning issued to Ms. Felix was similar to the warnings described in *Chang*, *Shockney*, and *DeHart* in that it recited, in considerable detail, the policies that the employer found Ms. Felix to have violated and the specific conduct constituting those

violations.  Likewise, the written reprimand given to Sartin contained detailed references to DHS' policies and the specific conduct of Sartin which violated those policies.

The *Felix* Court also pointed out more than once that Ms. Felix maintained that the contents of the reprimand were false, but despite these claims by Felix, the Court found that the written reprimand which she received was not a materially adverse action:

> The reprimand reflects an attempt by the Defendant to apply its pre-existing disciplinary rules to a situation where, at least on some level, those rules were arguably violated. A reasonable employee might disagree with discipline of this nature being imposed, but there is nothing in the reprimand issued to Ms. Felix that would lead a reasonable employee in the same circumstances to correlate the reprimand with acts of protected conduct, such that the reprimand would deter the employee from engaging in that protected conduct. (Indeed, although not strictly relevant, the Court notes that the reprimand did not deter Ms. Felix from thereafter engaging in protected conduct by filing an EEOC complaint.) Accordingly, Ms. Felix has failed to show that the reprimand constituted an adverse employment action for purposes of a retaliation claim.  *Felix*, 729 F. Supp. 2d at 1259.

As in *Felix*, Sartin also maintains that some of the grounds of the reprimand which she received are false, while admitting to the portion of the reprimand alleging that she referred to employees as "dumbasses."  (Exhibit #4, Plaintiff's Deposition at page 23 line 25 through page 24 line 4). However, also as in *Felix*, there was nothing in the reprimand issued to Sartin that would lead a reasonable employee in the same circumstances to correlate the reprimand with acts of protected conduct, such that the reprimand would deter the employee from engaging in that conduct. (Exhibit #8, Written Reprimand).  The written reprimand given to Sartin does not amount to a materially adverse action for the purposes of an FMLA retaliation claim.  Accordingly, Sartin cannot meet the second element of a *prima facie* case of retaliation based on the reprimand.

### B.  Travel to the Jay, Oklahoma office is not a materially adverse action.

Sartin's travel to the Jay, Oklahoma office following her FMLA leave can only be categorized as a retaliatory adverse action if it represented a *change* required by her employer

following her exercise of protected conduct.  In fact, in order to qualify as a materially adverse action, an alteration in job responsibilities must represent a *significant* change.  *Daniels v. United Parcel Service, Inc*., 701 F3d. 620, 635 (10th Cir. 2012).   However, Sartin's travel to the Jay office represents absolutely no change from her responsibilities before and after she took FMLA leave.  Prior to her surgery, Sartin traveled to the Jay Child Support office "several times per week" (according to her FMLA paperwork) or "at least two days a week, sometimes more" (according to her deposition testimony).  (See Exhibit #3, Certification of Health Care Provider for Employee's Serious Health Condition FMLA and Exhibit #4, Plaintiff's deposition at page 7, lines 11 through 12).  She also testified at her deposition that she was traveling to Jay "basically five days a week" in October and November 2014.  (Exhibit #4, Plaintiff's deposition at page 7, lines 12 – 14.)  When she returned from surgery in January 2015, she traveled to Jay an average of 2.77 times per week during her first six months back at work, according to a calendar kept by Sartin.  (Exhibit #7, Sartin's calendar documenting travel).  Her travel to Jay does not represent <u>any</u> alteration of her job responsibilities and it does not qualify as a materially adverse action for purposes of an FMLA retaliation claim.  Accordingly, Plaintiff cannot meet the second element of a *primae facie* case of retaliation based upon travel to the Jay office.

### III.  Sartin's Oklahoma Anti-Discrimination Act (OADA) claim fails for the same reasons as her federal claims because the OADA mirrors federal anti-discrimination protections.

The Oklahoma Anti-Discrimination Act provides:

A. It is a discriminatory practice for an employer:

1. To fail or refuse to hire, to discharge, or otherwise to discriminate against an individual with respect to compensation or the terms, conditions, privileges or responsibilities of employment, because of race, color, religion, sex, national origin, age, genetic information or disability, unless the employer can demonstrate

that accommodation for the disability would impose an undue hardship on the operation of the business of such employer;… 25 O.S. § 1302 (A)(1)

The OADA also creates a private cause of action for employment-based discrimination.  25 O.S. § 1350(A).  The protections provided by the OADA are co-extensive with the protections provided by federal law.  *McCully v. American Airlines, Inc.*, 695 F. Supp. 2d 1225, 1247 (N.D. Okla. 2010).  "A plaintiff's claim under the Oklahoma Anti Discrimination statutes fails for the same reasons her ADA and Title VII claims fail."  *Barzellone v. City of Tulsa*, 210 F.3d 389, 2000 WL 339213 (10th Cir. 2000) (unpublished).  In Oklahoma, a plaintiff's state law discrimination claims succeed or fail with her corresponding federal discrimination claims. *Bennett v. Windstream*, 30 F.Supp3d 1243, 1259 (N.D. Okla. 2014); *Hawkins v. Smith*, 46 F. Supp. 3d 1175, 1191 (N.D. Okla 2014).  Indeed, under the OADA, a defendant may assert any defense available to it under Title VII or the ADA.  25 O.S. § 1350(F).

The preceding sections of DHS' Motion for Summary Judgment have set forth multiple defenses to Sartin's federal claims, including her failure to make an adequate request for a reasonable accommodation under the ADA and the lack of any adverse action taken against her under the ADA.  The same defenses are available to DHS under the OADA and the OADA offers no additional protection for Sartin.  Accordingly, DHS should be granted summary judgment as to Sartin's claims under the OADA.

**IV.  A claim of intentional infliction of emotional distress cannot be maintained against DHS under the Government Tort Claim Act because intentional infliction of emotional distress cannot be inflicted in good faith.**

Sartin's sixth cause of action is a tort claim for intentional infliction of emotional distress (IIED), asserting that "Defendants' actions and conduct were intentional and reckless, and the same was of an extreme and outrageous nature" and have caused severe emotional distress. (Petition, Doc. 2-2 at ¶¶61 and 62).  The Oklahoma Governmental Tort Claims Act (GTCA)

provides that a state agency like DHS "shall not be liable under the provisions of this act for any act or omission of an employee acting outside the scope of his employment." 51 O.S. §153(A). The tort of IIED when alleged against a state agency requires proof that an employee acted in bad faith (or intentionally), and therefore, outside the scope of his employment. Since liability under the GTCA can only be based upon the good faith performance of duties by government employees, the proof required to succeed upon an IIED claim precludes liability under the Act. *See McMullen v. City of Del City,* 920 P.2d 528 (Okla. Ct. App. 1996) (holding city immune from IIED claim under the GTCA). Consequently, Sartin may not recover against DHS under the GTCA for IIED and DHS' Motion for Summary Judgment should be granted on this claim.

## V.  Conclusion

For the reasons set forth herein, the Court must grant Summary Judgment to the Oklahoma Department of Human Services on all remaining claims in this lawsuit.

Respectfully submitted,

*s/ Anastasia S. Pederson*
Anastasia S. Pederson (OBA #17118)
John E. Douglas (OBA #2447)
Assistant General Counsel
Department of Human Services
P.O. Box 25352
Oklahoma City, OK 73125-0352
Telephone: (405) 521-3638
Facsimile: (405) 521-6816
E-mail: Stacy.Pederson@okdhs.org

*Attorneys for Defendant Oklahoma
Department of Human Services*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of October, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant:

Tony Mareshie
*Attorney for Plaintiff*

*s/ Anastasia S. Pederson*
Anastasia S. Pederson